IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHRISTY M. LIEBEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-12-1315-C |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

This case arises out of a dispute over the termination of Plaintiff Christy M. Liebel's long-term disability benefits, provided pursuant to a Benefit Plan ("Plan") established by Marriott International, Inc., Plaintiff's employer, and issued and administered by Defendant Aetna Insurance Company. Plaintiff asks the Court to reverse the decision of Defendant's Plan administrator and reinstate Plaintiff's long-term disability benefits. The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), governs Plaintiff's claim.

## I. BACKGROUND

Plaintiff has a long history of back problems, from being diagnosed with scoliosis as a teenager to having multiple corrective surgeries as an adult. Two subsequent car accidents further exacerbated her back condition. Following another back surgery on March 30, 2009, Plaintiff requested and Defendant approved short-term disability benefits for April 6, 2009, through October 4, 2009. On August 11, 2009, Defendant approved Plaintiff for long-term disability benefits, finding Plaintiff totally disabled from her own occupation as a Lead

Referral Manager and informing Plaintiff she was eligible to receive 24 months of benefits, beginning September 28, 2009, and continuing as long as she remained disabled from her own occupation during that period. Defendant explained that after it paid the first 24 months of benefits, Plaintiff would only be considered disabled and eligible to continue receiving benefits if she was "unable to work at any reasonable occupation," not just her own. (Admin. Record ("A.R."), Dkt. No. 19-6, at 116[1].)

Approximately one year later, the Social Security Administration concluded Plaintiff became disabled on March 27, 2009, and eligible for disability benefits five months later. Accordingly, the Social Security Administration granted Plaintiff a monthly benefit from August 2010 forward and a lump sum to cover benefits that should have been paid from September 2009 through July 2010. Under the terms of the Plan, Plaintiff's Social Security benefits reduced the monthly long-term disability benefit paid to Plaintiff by Defendant.

In February 2011, Defendant notified Plaintiff in a letter that the applicable test of disability would change in September 2011, after the first 24 months of benefits had been paid. The letter reminded Plaintiff that instead of examining whether she could perform the material duties of her own occupation, Defendant would analyze whether her injuries prevented her from working at any reasonable occupation. Defendant informed Plaintiff that it would be reviewing her case to determine if Plaintiff would remain eligible for benefits.

---

[1] For the sake of clarity, ECF page numbers are used when citing to the Administrative Record.

As part of Defendant's investigation, Defendant requested medical records for Plaintiff from three of Plaintiff's physicians: Dr. Richard Hostin, Jr., Dr. Douglas Stafford, and Dr. Christine Johnson. Dr. Johnson also submitted an Attending Physician Statement dated April 28, 2011, stating that Plaintiff would never be able to return to work. Using the information provided by Plaintiff's physicians, Defendant conducted a clinical review on July 13, 2011. Defendant concluded that Plaintiff might have a greater functional capacity than indicated by her physicians, given her ability to travel approximately 200 miles one-way to see Dr. Johnson. The review concluded Plaintiff's records did not support an inability to perform any sustained sedentary work. Following the receipt of additional information from Dr. Johnson on June 22, 2011, in which Dr. Johnson again asserted Plaintiff could not return to work, Defendant referred Plaintiff's file for a second clinical review. The second clinical review again pointed to inconsistencies in Plaintiff's records, particularly with respect to Plaintiff's daily activities of walking her dog, driving, and grocery shopping. As a result, the second review likewise concluded that Plaintiff's records failed to support a total restriction on sedentary work.

Because Defendant's clinical reviews conflicted with Plaintiff's Attending Physician Statement from Dr. Johnson, Defendant hired Dr. Swotinsky, an occupational medicine specialist, to review Plaintiff's file and conduct a peer-to-peer consultation with Dr. Johnson. Dr. Swotinsky's August 2011 review consisted of records from Dr. Hostin, Dr. Johnson, Plaintiff's pain management specialist, a CT, and an MRI. After reviewing Plaintiff's records and reported daily activities, consulting with Dr. Johnson, and requesting but failing

3

to hear back from Dr. Hostin, Dr. Swotinsky concluded that the evidence did not support a restriction on sedentary work. Specifically, Dr. Swotinsky noted that Plaintiff's activity level was inconsistent with total disability and that because Dr. Johnson relied on Plaintiff's subjective self-reports of pain without objective medical evidence, her opinion of total disability was not persuasive.

The difference between Dr. Swotinsky's and Dr. Johnson's opinions on Plaintiff's level of disability led Defendant to refer Plaintiff for a Functional Capacity Evaluation ("FCE"), which took place on September 8, 2011, with a physical therapist. The therapist reported that "[a] true physical demand category was unable to be determined due to client refusal to attempt activities, inconsistent effort and self-limiting behavior." (A.R., Dkt. No. 19-5, at 17.) For example, the therapist stated that Plaintiff performed inconsistently on many of the tests, her physiological responses—her heart and respiratory rates—did not support her subjective complaints of pain, and she claimed she was unable to reach past knee level without balance support during the formal exam but was later observed crouching and picking up a drink from the floor without any compensating balance movements.

The following month, on October 8, 2011, a registered nurse conducted a home assessment of Plaintiff at Defendant's request. Plaintiff answered all of the nurse's questions but spent most of the interview in a recliner and then completed it while lying in bed. The home assessment form states that Plaintiff reported having a walker and wheelchair, although the nurse did not see them and Plaintiff later denied owning any assistive devices. Despite being able to walk for 27 minutes at her FCE one month earlier, Plaintiff reported being able

4

to walk only a few feet, and that very slowly and stiffly. The registered nurse recommended lumbar and cervical surgery to decrease Plaintiff's pain level in order to assist Plaintiff in returning to work.

After analyzing the reports of Plaintiff's FCE and home assessment, Defendant hired Dr. Carl, a specialist in physical medicine and rehabilitation with a sub-specialty in pain management, to perform an Independent Medical Evaluation ("IME"). In addition to the physical examination of Plaintiff, as part of the IME Dr. Carl also reviewed Dr. Swotinsky's physician review, correspondence with Dr. Johnson, the FCE, the home assessment, a note by Dr. Hostin, and summaries of Plaintiff's medical history and medications, prepared by Plaintiff. Dr. Carl concluded that Plaintiff was "physically capable of performing sedentary level work with occasional lifting of 1-10 pounds, negligible frequent lifting, and negligible constant lifting throughout the workday" with a further restriction of no crawling, bending, or twisting. (A.R., Dkt. No. 19-5, at 53.) Although Dr. Carl acknowledged that Plaintiff "is physically capable of operating a motor vehicle," he opined that Plaintiff should work in a home setting because of the narcotics Plaintiff uses to treat her chronic pain. Additionally, Dr. Carl worried that Plaintiff's narcotic use might have impaired her "higher executive cognitive functioning." (Id.)

Due to Dr. Carl's concerns about Plaintiff's narcotic use, Defendant had another physician, Dr. VanderPutten, conduct a peer-to-peer consultation with Dr. Johnson by telephone on January 4, 2012. Dr. VanderPutten reported that "Dr. Johnson does not believe that medications, per the concern of the IME, are an issue" and that Dr. Johnson "believes

5

it would be beneficial in some ways for [Plaintiff] to work however it has been difficult to find employment that would accommodate sedentary capacity with 'work hardening' to address fatigue issues." (A.R., Dkt. No. 19-8, at 85.) After reviewing Dr. VanderPutten's report, Dr. Johnson did not deny that she had told Dr. VanderPutten that she did not believe Plaintiff's narcotic use would be an issue, but did give a more detailed discussion of her proposed trial of return to work. According to Dr. Johnson, Plaintiff would need "supervision and assistance from a vocational counselor" and "[t]he return to work would be performed in a gradual fashion, specifically . . . one to two hours daily at the initiation." (A.R., Dkt. No. 19-8, at 88.) Dr. Johnson did not believe Plaintiff could return to sedentary work on a full-time basis successfully without a vocational counselor and a gradual work hardening program.

Later that month, Defendant referred Plaintiff's claim for an occupational assessment. Defendant conducted the assessment February 6, 2012. Based on Plaintiff's occupational skills, prior work history, and a sedentary level work capacity, Defendant concluded Plaintiff "possesses numerous transferable skills to sedentary occupations . . . in both Oklahoma and Texas that would likely meet reasonable wage of $17.89 per hour," or 60% of Plaintiff's pre-disability salary. (A.R., Dkt. No. 19-2, at 191-193.) Defendant then terminated Plaintiff's long-term disability benefits on February 7, 2012, after awarding Plaintiff a lump-sum benefit payment, to assist in a gradual return to work. Defendant allowed Plaintiff to appeal its decision but, after further review, upheld its termination on July 3, 2012. Plaintiff subsequently filed this lawsuit against Defendant.

## II. STANDARD OF REVIEW

Unless an insurance plan provides otherwise, the Court "'review[s] a denial of plan benefits "under a *de novo* standard."'" Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231 (10th Cir. 2012) (quoting Metro Life. Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008) (internal citations omitted)). When a "plan confers upon the administrator discretionary authority to determine eligibility for benefits or to interpret plan terms, 'a deferential standard of review is appropriate.'" Id. (quoting Glenn, 554 U.S. at 111). However, if the administrator "act[s] in a dual role, i.e., both evaluating and paying claims," the administrator operates under "a conflict of interest." Id. at 1232. In dual-role conflict cases, the Court uses "a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'" Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1192 (2009) (quoting Glenn, 554 U.S. at 117). The Court "'weigh[s] the conflict of interest as a factor in [its] abuse of discretion analysis, and . . . weigh[s] [that factor] more or less heavily depending on the seriousness of the conflict.'" Foster, 693 F.3d at 1232 (quoting Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1157 n.1 (10th Cir. 2010)). "'[W]here circumstances suggest a higher likelihood that [the conflict] affected the benefits decision,'" the Court gives the conflict factor more importance. Holcomb, 578 F.3d at 1193 (quoting Glenn, 554 U.S. at 117). Conversely, the conflict factor "'should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" Id. (quoting Glenn, at 117). In conducting its review, the Court is "'limited to

7

the administrative record—the materials compiled by the administrator in the course of making his decision.'" Foster, 693 F.3d at 1231 (quoting Holcomb, 578 F.3d at 1192)).

Here, the Plan indisputably gives Defendant "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under [the Plan]." (A.R., Dkt. No. 19-9, at 63.) Thus, the Court analyzes Defendant's termination of benefits under the deferential abuse of discretion or arbitrary-and-capricious standard. See Foster, 693 F.3d at 1233. Because Defendant operates in a dual role, both evaluating and paying claims, the Court evaluates whether Defendant abused its discretion by applying the combination-of-factor analysis set out in Glenn and adopted by the Tenth Circuit in Holcomb. However, due to Defendant's efforts to reduce potential bias—such as "hiring [multiple] independent physicians . . . [rather than] rely[ing] solely on the evaluations and medical opinions of its own on-site physicians and nurses,"[2] "diligently endeavor[ing] to discover the nature of [Plaintiff's] ailments,"[3] and continuing to pay benefits to Plaintiff during the course of its investigation, "even though the

---

[2] For example, Defendant hired Dr. Swotinsky, Dr. Carl, and Dr. VanderPutten to independently review Plaintiff's file, examine Plaintiff in person, and conduct peer-to-peer consultations with Plaintiff's treating physicians.

[3] Like the defendant in Holcomb, Defendant conducted a lengthy investigation into Plaintiff's claim. Defendant's efforts included two clinical reviews, an independent review, peer-to-peer consultations, an FCE, a home assessment, an IME, and an occupational assessment. Defendant also frequently requested information from Plaintiff's treating physicians and allowed Plaintiff to submit additional information during her appeal.

twenty-four month period . . . had expired"[4]— the Court gives little weight to the dual-role conflict-of-interest factor. Holcomb, 578 F.3d at 1193.

### III. ANALYSIS

Applying the appropriate standard of review, the Court concludes Defendant did not abuse its discretion in deciding to terminate Plaintiff's long-term disability benefits. The Administrative Record contains substantial evidence supporting Defendant's decision. First, as described supra, Defendant gathered significant medical evidence and considered not only records provided by Plaintiff's treating physicians, but also examinations and reviews conducted by independent experts. Although Plaintiff claims Defendant's final conclusion was contrary to the recommendation of Plaintiff's primary treating physician, Dr. Johnson, nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). Moreover, Dr. Johnson's later correspondence with Defendant did not completely rule out Plaintiff returning to work. Dr. Johnson informed Dr. VanderPutten and Defendant that she believed it might even be beneficial for Plaintiff to return to work, provided certain conditions were met.

---

[4] Defendant continued to pay benefits after the initial 24-month period expired in September 2011. Plaintiff received benefits through February 2012, when Defendant terminated further benefits and awarded Plaintiff a lump-sum to permit her to return to work gradually.

9

Additionally, unlike in Glenn, where the defendant "failed to provide its independent vocational and medical experts with all of the relevant evidence,"[5] (Glenn, 554 U.S. at 118) Defendant not only gave its independent experts copies of Dr. Johnson's opinions, among other records, it also directed those experts to communicate directly with Dr. Johnson during peer-to-peer consultations.  And, when Defendant received conflicting evidence, it sought additional consultation, examinations, and review.  Although an administrator may not "emphasize[] a certain medical report that favor[s] a denial of benefits" while "deemphasiz[ing] certain other reports that suggest[] a contrary conclusion," Glenn, 554 U.S. at 118, that does not appear to be the case here.  Instead, Defendant relied on multiple reports and pieces of evidence that Plaintiff could return to work, with certain restrictions, including recommendations by Dr. Swotinsky, Dr. Carl, and Dr. Johnson, and Defendant's credibility determination, based on inconsistencies noted during Plaintiff's FCE and home assessment.

Likewise, the fact that Defendant's ultimate determination that Plaintiff is capable of performing sedentary work with certain limitations is contrary to the Social Security Administration's finding of total disability is not conclusive.  Because Plaintiff's award of Social Security benefits was financially advantageous to Defendant, any inconsistency

---

[5] Plaintiff argues that Defendant failed to provide its independent experts with all of the relevant evidence because Defendant did not direct those physicians to consider Plaintiff's fibromyalgia.  However, the Administrative Record does not contain a diagnosis of fibromyalgia and thus any reviewing physicians could not have considered that condition as a factor in her ability to return to work.  Defendant's reviewing physicians and specialists properly considered the condition of Plaintiff's back and her narcotic use, conditions which appeared in Plaintiff's files. In determining whether the Plan administrator made an arbitrary decision, the Court is limited to the Administrative Record.  Foster, 693 F.3d at 1231.

between its assistance in helping Plaintiff receive government disability benefits and its termination of its own long-term disability benefits weighs in favor of Plaintiff. See id. However, other considerations mitigate that inconsistency in this case. Significantly, the Social Security Administration's disability determination occurred in August 2010, a year and a half before Defendant concluded Plaintiff could return to sedentary work. Furthermore, the test for disability set out in the Plan is different than a determination of disability under the Social Security criteria.[6]

Finally, Plaintiff asserts that even if she was capable of returning to sedentary work, the Court must reject the Plan administrator's decision as arbitrary because Defendant has not demonstrated that Plaintiff is employable at 80% of her prior earnings. This argument is without support. After the first 24 months of benefits, Defendant no longer had to find that Plaintiff was employable at 80% of her prior earnings. Instead, the Plan requires Plaintiff to be "unable to work at any **reasonable occupation**" because of her disability. (A.R., Dkt. No. 19-9, at 8.) The Plan later defines "reasonable occupation" as "any gainful activity" for which Plaintiff "[is], or may reasonable [sic] become, fitted by education, training, or experience," and "[w]hich results in, or can be expected to result in, an income of more than 60% of [Plaintiff's] **adjusted predisability earnings**." (A.R., Dkt. No. 19-9, at 28.) Thus,

---

[6] For instance, the deference given to treating physicians in disability determinations made under the Social Security Act does not govern private benefit plans under ERISA. Black & Decker, 538 U.S. at 829-833.

Defendant's use of 60% of Plaintiff's adjusted predisability earnings at its occupational assessment was correct under the terms of the Plan.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's denial of Plaintiff's claim for continuing long-term disability benefits did not violate ERISA, as Defendant's decision was neither arbitrary nor capricious and is supported by substantial evidence in the Administrative Record.  Accordingly, judgment shall enter for Defendant and against Plaintiff.

IT IS SO ORDERED this 31st day of January, 2014.

_____
ROBIN J. CAUTHRON
United States District Judge